UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE NORTHERN ASSURANCE      )
COMPANY OF AMERICA,         )
                            )
            Plaintiff,      )    CIVIL ACTION NO.
                            )    10-11998-DPW
v.                          )
                            )
DANIEL J. KEEFE, JR.,       )
                            )
            Defendant.      )

MEMORANDUM AND ORDER
February 23, 2012

The Northern Assurance Company of America ("Northern

Assurance") filed this action seeking declaratory judgment

pursuant to the Federal Declaratory Judgment Act, 28 U.S.C.

§ 2201, that it is not obligated to indemnify Daniel J. Keefe,

Jr., for any costs, expenses, or damages relating to the

grounding of the M/V WILHELMINA under the Yacht Policy issued by

Northern Assurance to Keefe.  Keefe responded with six

counterclaims, all relating to Northern Assurance's failure to

pay what Keefe claims is owed under the insurance contract.  The

parties have filed cross-motions for summary judgment.

## I.  BACKGROUND

### A.  *FACTUAL BACKGROUND*

Daniel J. Keefe, Jr., is the owner of the yacht the M/V

WILHELMINA.  Since he obtained ownership of the yacht in the mid-

2000s,[1] he has maintained recreational yacht insurance coverage through Northern Assurance.  The Yacht Policy covers "[a]ccidental, direct physical loss of or damage to the insured property."  The Policy provides $265,000.00 in insurance.

The Policy includes a "Protection and Recovery Expenses" clause, stating that the insurer "will pay the reasonable costs 'you' incur to protect or recover the covered 'yacht' from further loss or damage following an insured loss."  The Policy also includes clauses providing coverage for, inter alia, "Commercial Towing and Assistance," "Liability Insurance" (describing coverage for loss of life and bodily injury and property damage), and "Pollution Liability."  The Policy explicitly excludes coverage for "any loss, injury, damage or expense arising out of or during any illegal purpose on 'your' part or on the part of anyone using the insured property with 'your' permission."

The Yacht Policy coverage was originally limited only to "private pleasure" excursions.  The Policy states:

> Coverage under this policy applies only while the covered "yacht" is used for private pleasure purposes.  This includes recreational boating and leisure time activities.  There is no coverage while the covered "yacht" is used for charter, hire, to carry persons or property for a fee or for any other commercial use unless prior written consent has been obtained from "us".  Commercial use includes use in any

---

[1]  There is some dispute about whether Keefe acquired the yacht in 2003-04 or in 2006.  The year of acquisition is not relevant to the motion before me.

2

trade, occupation, or profession.  Business entertainment for which there is no direct remuneration is private pleasure use.

Dkt. 1-2, p. 8.

In May, 2008, Keefe requested and Northern Assurance issued a Chartering Coverage Endorsement, adding breadth of coverage to the Policy.  The Endorsement states:

You may charter the yacht described on the declarations page of this policy, subject to the following special terms and conditions:
1.   **NO MORE THAN 6 PASSENGERS** may be carried on board the yacht.
2.   You may not have more than **12** charters in one policy year.
3.   With regard to **Sections B-1 - LIABILITY INSURANCE, B-2 - POLLUTION LIABILITY, and SECTION D - MEDICAL PAYMENTS,** a deductible of **$100.00** shall apply to all claims arising from any one accident or occurrence.
. . . .
7.   The NON-OWNED YACHT coverage provided in this policy will be null and void during the entire duration of any charter.
8.   **SECTION C - LONGSHORE AND HARBOR WORKERS' COMPENSATION INSURANCE** shall be null and void during the entire duration of any charter.
IF YOU VIOLATE ANY OF THESE TERMS AND CONDITIONS AT ANY TIME, THIS POLICY SHALL IMMEDIATELY BECOME NULL AND VOID, AND SHALL REMAIN NULL AND VOID DURING THE TERM OF SUCH VIOLATION.

The coverage issued is the only charter coverage available through Northern Assurance.  The Yacht Policy, with the Chartering Coverage Endorsement, was renewed and in effect for the time period of August 30, 2009, through August 30, 2010.

On August 21, 2010, Keefe agreed to charter the yacht for eighteen passengers.[2]  He did not obtain  prior written consent for this number of passengers from the insurance company. During the Charter on August 21, 2010, the passengers, Keefe, and one additional crew-member were aboard.

While the yacht was engaged in the Charter, it grounded on a shoal known as Devil's Back and became stuck.  Keefe claims that at the time of the grounding there was not much damage to the hull.  The passengers were removed after the grounding by a Massport vessel; none of the passengers was injured.  After the passengers departed, the salvage personnel began to work.  Keefe claims that as the tide receded after the passengers disembarked, the vessel laid over, and that only then was the bottom of the boat punctured.

The United States Coast Guard investigated the grounding and fined Keefe for negligent operation and for "carrying passengers without a valid Certificate of Inspection."  The Coast Guard Report stated that "[t]he WILHELMINA has a 5 ½' draft" and that "Devil's Back is charted to have only a 1' depth and pierced the

_____

[2]  There is some evidence that the yacht was chartered for (and was carrying) sixteen passengers.  Uncertainty regarding the number of passengers is not material to the pending motion; the parties agree that the yacht was chartered for more than six passengers and that more than six passengers were aboard at the time of the grounding.

hull of the WILHELMINA just starboard of the centerline causing uncontrollable flooding."

Keefe filed a Statement of Loss with the insurer on August 26, 2010, stating:

> Vessel grounded on a rock outside of North Channel SE of #5 while heading toward the channel.  As the tide fell the boat listed to starboard and the rock penetrated the hull midship starboard side.  Vessel was flooded as the tide came in.  18 persons and 2 crew were on board.  All people were removed with no injury to report.

(original in mostly capital letters).

The vessel was hauled to Boston Harbor Marina & Shipyard on the day after the accident and remained there as of the filing of the motions before me.  Keefe claims that the cost to repair the yacht is estimated to be $195,557.31 and the current value of the yacht is estimated to be $16,000.00.  He claims that while the vessel has not been repaired, it has been cleaned and the engines have been pickled at a cost of $3,410.86.  He claims that the storage bill for the yacht as of September, 2011, was approximately $11,000.  Northern Assurance disputes these expenses, but does not provide an alternative statement as to what expenses and damages have actually been incurred.

On September 8, 2010, Northern Assurance sent Keefe a letter explaining that it was investigating his compliance with the Chartering Coverage Endorsement and reserving its rights to deny coverage.  On September 27, 2010, Keefe (through counsel) sent Northern Assurance a demand letter pursuant to G.L. c. 93A

demanding that Northern Assurance provide coverage for the loss and costs.  On October 27, 2010, Northern Assurance responded to the demand letter and made no offer of settlement.  On November 15, 2010, Northern Assurance issued Keefe a Denial of Coverage letter.

**B.   *PROCEDURAL HISTORY***

Northern Assurance filed this suit on November 18, 2010 seeking a declaration that it is not obligated to indemnify Keefe for his loss, for any protection and recovery expenses, or for any other costs, expenses, or damages relating to the grounding and damages to the M/V WILHELMINA.

Keefe's six counterclaims, filed on December 1, 2010, seek the following: (1) declaratory judgment that Northern Assurance is obligated under the Policy to pay Keefe for the loss, salvage costs, and equipment protection expenses; (2) judgment against Northern Assurance for breach of contract due to its failure to provide coverage under the Policy; (3) judgment against Northern Assurance for breach of the implied covenant of good faith and fair dealing due to its refusal to provide coverage under the Policy; (4) judgment against Northern Assurance for engaging in unfair trade practices under G.L. c. 93A for its refusal to provide coverage under the Policy; (5) judgment against Northern Assurance for engaging in unfair claim settlement practices in violation of G.L. c. 176D for failing to provide coverage under

the Policy; and (6) declaratory judgment that Northern Assurance is obligated to pay Keefe for any losses suffered and for any salvage or equipment protection expenses undertaken after the passengers disembarked from the yacht.

Northern Assurance's motion for summary judgment contends that it properly denied coverage to Keefe, a holding in favor of which also would resolve Keefe's counterclaims, all of which depend on wrongful denial of coverage. I accept Northern Assurance's contention in disposing of the cross-motions for summary judgment before me.

## II.  STANDARD OF REVIEW

A movant is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch. v. RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (quoting *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp.,* 532 F.3d 28, 30 (1st Cir. 2008)).

In evaluating a motion for summary judgment, a court "must construe the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor

while safely ignoring conclusory allegations, improbable inferences, and unsupported speculation." *Collins v. University of New Hampshire*, 2011 WL 6350429, at *4 (1st Cir. 2011). "Where, as here, a district court [is called upon to] rule[] simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." *Estate of Hevia v. Portrio Corp.,* 602 F.3d 34, 40 (1st Cir. 2010). Thus, the "court may enter summary judgment only if the record, read in this manner, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.*

## III.  ANALYSIS

### A.  JURISDICTION

The district courts have original jurisdiction over "any civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333. "Suits on maritime insurance policies are classic examples of matters within federal maritime jurisdiction." *Central Int'l Co. v. Kempter Nat'l Ins. Cos.*, 202 F.3d 372, 373 (1st Cir. 2000). *See also Acadia Ins. Co. v. McNeil*, 116 F.3d 599, 602 (1st Cir. 1997) ("It is, therefore, readily evident that the protection afforded by the yacht policy is tied closely to the pleasure boat and matters arising out of its ownership, operation, and maintenance in specified waters. On that basis, the yacht policy constitutes an ocean marine policy within the

federal courts' admiralty jurisdiction."); *Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 54 (1st Cir. 1995) ("The propriety of maritime jurisdiction over a suit involving a maritime insurance policy is unquestionable.").

**B.   *CHOICE OF LAW***

Although this Court's jurisdiction is clear, the First Circuit has noted that the appropriate choice of law is not:

> Beneath this surface agreement on general principles [regarding jurisdiction] lies an abyss of confusion.  One might think that construing a maritime insurance policy, in relation to damage occurring on the high seas, would be a paradigm case for a uniform body of federal law.  But the tensions in Supreme Court precedents are legendary . . . with regard to the reach of state law in federal maritime law generally . . . .

*Central Int'l Co.*, 202 F.3d at 373.  The confusion was manifest in the briefing submitted for this case.

The Policy states that "[t]he rights and obligations of the parties under this policy shall be governed by the general maritime law of the United States."  However, not "every term in every maritime contract can only be controlled by some federally defined admiralty rule.  In the field of maritime contracts, as in that of maritime torts, the National Government has left much regulatory power in the States."  *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313 (1955).  This observation holds especially true in the instant case, because "this state regulatory power, exercised with federal consent or acquiescence,

has always been particularly broad in relation to insurance companies and the contracts they make." *Id.* at 314.

In *Wilburn Boat Co.*, the Supreme Court held that "in the absence of controlling Acts of Congress," a court should ask whether a judicially established federal admiralty rule governs the interpretation of the policy, and whether, in the absence of such a rule, a court should fashion one. *Id.* The Supreme Court concluded that there was no such rule and that "[t]he whole judicial and legislative history of insurance regulation in the United States warns us against the judicial creations of admiralty rules to govern marine policy terms and warranties." *Id.* at 316. It held that the Court, "like Congress, [would] leave the regulation of marine insurance where it has been—-with the States." *Id.* at 321.

In their initial briefing, both parties relied on *Wilburn Boat Co.* and its progeny and agreed that Massachusetts law, instead of federal admiralty law, should be applied to construe the marine insurance policy at issue here. Northern Assurance stated that "[t]here is no judicially established rule under General Maritime Law concerning a breach of a passenger warranty clause." Keefe stated that "[a]s a general principle, the First Circuit has held that all questions involving the interpretation of marine insurance policies are to be governed by state law." Unfortunately, neither party paid more than lip service to the

Supreme Court's most recent discussion of choice of law issues in maritime cases in *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14 (2004), and both parties overlooked the First Circuit's most recent discussion of federal admiralty law regarding breaches of warranties in maritime insurance contracts in *Lloyd's of London v. Pagan-Sanchez*, 539 F.3d 19 (1st Cir. 2008).

In *Norfolk S. Ry. Co.*, the Supreme Court held that "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Norfolk S. Ry. Co.*, 543 U.S. at 23. It elaborated that "when state interests cannot be accommodated without defeating a federal interest, as is the case here, then federal substantive law should govern." *Id* at 27.

Applying the principles of *Norfolk S. Ry. Co.*, the First Circuit in *Lloyd's of London* investigated whether there was a well-established general federal rule governing the contract at issue, and, upon finding such a rule, stated that "the question becomes whether [the state] has either clearly stated a contrary rule or demonstrated a strong interest in having a different rule. Only if so, would we address the question of whether this is inherently a local dispute to [the state]." *Lloyd's of London*, 539 F.3d at 25. I will follow the same analytic framework to determine whether federal admiralty law or Massachusetts law governs in the instant case, and in an

abundance of caution I will make alternative determinations under both bodies of law.

## C.    *ISSUES PRESENTED*

At issue is whether the statements in the Chartering Coverage Endorsement that Keefe "may charter the yacht . . . subject to the following special terms and conditions: (1) **NO MORE THAN 6 PASSENGERS** may be carried on board the yacht" and "IF YOU VIOLATE ANY OF THESE TERMS AND CONDITIONS AT ANY TIME, THIS POLICY SHALL IMMEDIATELY BECOME NULL AND VOID, AND SHALL REMAIN NULL AND VOID DURING THE TERM OF SUCH VIOLATION" (emphases in original) are sufficient bases to deny Keefe coverage under the Policy, when Keefe ran aground on Devil's Back with far more than six passengers aboard on a chartered excursion.[3]

---

[3]    Northern Assurance argues that Keefe breached an additional warranty by negligently operating the vessel and carrying passengers without a valid Certificate of Inspection. Northern Assurance argues that this violated the "Illegal Purpose" clause under the policy, which states that Northern Assurance "will not pay any loss, injury, damage or expense arising out of or during any illegal purpose on 'your' part or on the part of anyone using the insured property with 'your' permission." I need not decide whether negligent operation of the vessel or carrying passengers without a valid Certificate of Inspection is an "illegal purpose" under the Yacht Policy. Even if it is an "illegal purpose," the violation (carrying too many passengers on a charter) is the same and the analysis (regarding whether the violation affects the coverage despite the lack of causation and despite the claim that the damage occurred after the departure of the passengers) does not change. Northern Assurance cites no cases regarding this issue and Keefe cites only two, *Kelly v. Home Ins. Co.*, 97 Mass. 288 (1867), and *Ocean Ins. Co. v. Polleys*, 38 U.S. 157 (1839), which are related to unlawful contracts and not to illegal purpose clauses within contracts. Given the lack of pertinent briefing regarding

The parties raise three distinct questions regarding the application of this exclusion of coverage. The first is whether such a clause will be construed to exclude coverage even where, as here, the insurer provides no evidence that the breach of the condition led to or contributed in any way to the accident or the damage. The second is whether such a clause will be construed to exclude coverage for damage inflicted and expenses incurred after the passengers were evacuated by Massport, when, strictly speaking, the insured was no longer in violation of the passenger limitation. The third is whether the exclusions of the Chartering Coverage Endorsement apply to the property coverage (for damage to the yacht) or only to the liability coverage (for personal injury, etc., to passengers) provided by the Policy.

1.   **Impact of Breach of Warranty Without Causation**

I.   **Federal Admiralty Law**

Although both Northern Assurance and Keefe initially denied the existence of a judicially established federal admiralty rule regarding the breach of a warranty or condition, the First Circuit held otherwise in *Lloyd's of London*. The First Circuit held that "[t]he prevailing view, both in federal law and state maritime insurance law, is that a breach of a warranty will

_____

whether the charter constituted an "illegal purpose," where I need not decide the issue, I decline to do so.

excuse the maritime insurer from payment regardless of any causal connection to the loss." *Lloyd's of London*, 539 F.3d at 21.

The Policy's exclusion of charters for more than six passengers operates as a warranty as the First Circuit defined the term. The First Circuit cited 6 *Couch on Insurance* § 81:14 to define a promissory warranty as "one by which the insured stipulates that something shall be done or omitted after the policy takes effect and during its continuance," *id.* at 23, and cited the Second Circuit to define a warranty as "a promise by which the assured undertakes that some particular thing shall or shall not be done, or that some condition shall be fulfilled," *id.* (quoting *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 31 (2d Cir. 1999) (internal citation omitted)). In this case, the contract's exclusion of coverage for chartered excursions of more than six passengers was a promise by Keefe that he would not conduct charters of more than six passengers during the period of the insurance contract. It indicates an acknowledgment that if Keefe did conduct such charters, coverage would be null and void during that period.

The First Circuit concluded that where such a warranty exists in a marine insurance contract, it is a "well-established general rule," *id.* at 25, that "a breach . . . excuses the insurer from coverage," *id.* at 24. Thus, the First Circuit has held that there is a judicially established federal rule

governing this particular area of marine insurance contract interpretation; this Court may not ignore it, as both parties did, to focus almost exclusively on state law.[4]

### ii. Massachusetts Law

Massachusetts insurance law regarding the impact of a breach of warranty that does not lead to or contribute to the damages at issue is somewhat more complicated than federal maritime law. Nonetheless, the result is the same under the facts of this case: Keefe's coverage under the Chartering Coverage Endorsement is suspended during the breach, regardless of whether the breach led to the accident.

Under Massachusetts law, the terms 'condition' and 'warranty' that I have been using interchangeably thus far are distinct terms of art. The Massachusetts Supreme Judicial Court has explained how to distinguish between the two:

> [A] statement made in an application for a policy of insurance may become a condition of the policy rather than remain a warranty or representation if: (1) the statement made by the insured relates essentially to the insurer's intelligent decision to issue the policy; and (2) the statement is made a condition precedent to recovery under

---

[4] Keefe argues that *Lloyds* is distinguishable because the First Circuit addressed Puerto Rico and not Massachusetts law. This argument addresses "whether [a particular state] has either clearly stated a contrary rule or demonstrated a strong interest in having a different rule," *Lloyd's of London*, 539 F.3d 19, 25 (1st Cir. 2008), not whether the First Circuit has held that the courts have established a federal rule. Moreover, as I hold *infra*, Section III(C)(1)(ii), the analysis under Massachusetts law produces the same conclusion as the analysis under the federal rule.

the policy, either by using the precise words 'condition precedent' or their equivalent.

*Charles, Henry & Crowley Co. v. Home Ins. Co.*, 212 N.E.2d 240, 242 (Mass. 1965).

The difference between a condition and a warranty is crucial to the application of state law in this case because a Massachusetts statute provides:

> No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or on his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss.

G.L. c. 175, § 186. However, "General Laws c. 175, § 186, applies only to representations and warranties and does not apply to conditions precedent included expressly within the terms of a policy." *Charles, Henry & Crowley Co.*, 212 N.E.2d at 241-42.

Here, I find the exclusions within the Chartering Coverage Endorsement to be conditions precedent for purposes of Massachusetts insurance law. The limitation in coverage to charters with a maximum of six passengers "relate[d] essentially to the insurer's intelligent decision to issue the policy," *id.* at 240; not only is such a limitation a rational way to limit an insurer's risk, but the insurer, while being deposed, explained that it does not offer any other chartering packages beyond the package (with its six-passenger limitation) provided to Keefe.

While Keefe argues that the precise words "condition precedent" are not used, the policy includes "their equivalent," *id.*, by stating that "IF YOU VIOLATE ANY OF THESE TERMS AND CONDITIONS AT ANY TIME, THIS POLICY SHALL IMMEDIATELY BECOME NULL AND VOID, AND SHALL REMAIN NULL AND VOID DURING THE TERM OF SUCH VIOLATION."  This sentence states unambiguously that coverage is dependent on compliance with the terms and conditions in the Chartering Coverage Endorsement.  "The structure and phraseology" of the sentence and the preceding conditions "combine to make the whole functionally equivalent to a direct statement that the stipulations . . . comprise a condition precedent to recovery on the policy.  Any other construction would both mock common sense and lead inevitably to the nanization" of the chartering limitations.  *U.S. Fire Ins. Co. v. Producciones Padosa, Inc.*, 835 F.2d 950, 954-55 (1st Cir. 1987).

Because the conditions in the Chartering Coverage Endorsement are conditions precedent, G.L. c. 175, § 186 does not apply and "coverage will be avoided whether or not the breach in fact contributed to the accident."  *Charles, Henry & Crowley Co.*, 212 N.E.2d at 242.  "Conformance with stated conditions that are agreed to govern the attachment of the policy is obligatory, regardless of their irrelevancy to the actual loss."  *U.S. Fire Ins. Co.*, 835 F.2d at 954.  Thus, whether or not the presence of an excess of passengers on the chartered excursion was a

contributing factor to the grounding of the M/V WILHELMINA, the
exclusion of the Chartering Coverage Endorsement still applies
under Massachusetts law.

### iii.  Accommodation of State Interests

The well-established federal admiralty rule and
Massachusetts law construe the Policy in the same way, such that
the exclusions in the Chartering Coverage Endorsement apply
whether or not the breach of the condition was related to the
accident.  Thus, "state interests can[] be accommodated without
defeating a federal interest," *Norfolk S. Ry. Co.*, 543 U.S. at
27.  Where the state has not "clearly stated a contrary rule or
demonstrated a strong interest in having a different rule," the
First Circuit would not determine "the question of whether this
is inherently a local dispute . . . ."  *Lloyd's of London*, 539
F.3d at 25.  Nor will I.[5]

---

[5]  I will note, as the Supreme Court did in 1955, that the
"state regulatory power, exercised with federal consent or
acquiescence, has always been particularly broad in relation to
insurance companies and the contracts they make."  *Wilburn Boat
Co. v. Fireman's Fund Ins. Co.*, 248 U.S. 310, 314 (1955).  The
Supreme Court stated:
> The whole judicial and legislative history of insurance
> regulation in the United States warns us against the
> judicial creation of admiralty rules to govern marine policy
> terms and warranties.  The control of all types of insurance
> companies and contracts has been primarily a state function
> since the States came into being.

*Id.* at 316.  Thus, there is certainly historical support for the
proposition that a marine insurance dispute, at least where (as
here) it is between a local insurance company and a local boat-
owner and involves no other actors, is "inherently local."
*Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004).

## 2.    Reinstatement After Breach of Warranty

Keefe argues that even if the conditions in the Chartering Coverage Endorsement are construed to apply to the grounding, Northern Assurance nonetheless remains obligated to provide coverage for any damage incurred by the vessel *after* the passengers disembarked.  The Endorsement states that the Policy "SHALL REMAIN NULL AND VOID DURING THE TERM OF SUCH VIOLATION." Keefe contends that the term of violation ended when the passengers disembarked, and so the Policy should have been reinstated at that time.

Neither party presents any case law (federal or state) applicable to the issue.[6]

### I.    Federal Admiralty Law

While two federal circuits have adopted a rule governing the issue, I nonetheless hold that no judicially established federal admiralty rule exists here.

The Second Circuit addressed the issue in what has been termed "the celebrated case," *Canal Ins. Co. v. Baldree*, 489 F.2d 1393, 1395 (5th Cir. 1974), of *Hejnes v. Aetna Ins. Co.*, 132 F.2d 715 (2d Cir. 1943).  In *Hejnes*, a tug was towing more than one

---

[6]  Northern Assurance, for its part, appears to misunderstand Keefe's argument, responding that Keefe is misconstruing the clause regarding salvage in the Yacht Policy. Keefe's argument, as I understand it, is based not on the salvage clause but instead on the language that the Policy "SHALL REMAIN NULL AND VOID *DURING THE TERM OF* SUCH VIOLATION" (emphasis added).

barge in violation of a promissory warranty in its maritime insurance policy when a storm began. When the tug was pulled into shallow water and endangered, its captain "cut loose in an attempt to take his vessel to safety." *Hejnes*, 132 F.2d at 717-18. However, it was too late; "[t]he tug soon sank and was a total loss." *Id.* at 718.

At the time that the tug sank, it "was not towing in violation of warranty in the policy," *id.*, because it had cut loose from the barges. Nonetheless, the Second Circuit held that the policy excluded coverage:

> [O]ur construction need not, and does not, permit a tug owner to break the warranty by towing more than one vessel and when trouble comes get his insurance back in force in ample time as a practical matter merely by cutting the line to the forbidden tow. A tug owner cannot thus have the benefit of low-rate insurance with more extensive towage operations than his policy permits . . . . The insured may not by breach of warranty increase the risk and put that added burden upon the insurer. The latter need take back only what he had before and that obviously did not include the dangers faced by the tug in fulfilling her duty to her tow of this kind at this place. The undisputed evidence here was that the vessel while the policy was suspended became involved in a severe storm; was pulled into shallow water because she was too small for the job she tried to do; pounded on the bottom for about twenty minutes; and then was freed of her tow only because her own need to seek safety from dangers so created required her freedom to such an extent. Even so, her every effort to save herself was fruitless though she had the aid of a Coast Guard cutter. That evidence, we think, left no fair question of fact to be decided by the jury.

*Id.* at 720. Under the principle stated in *Hejnes*, Northern Assurance would not be obligated to indemnify Keefe for injuries incurred after the passengers disembarked because Northern

Assurance must reinstate coverage only when no dangers were posed during and remained after the breach of warranty.

The *Hejnes* principle has also been explicitly endorsed by the Fifth Circuit.[7]  The Fifth Circuit, citing *Hejnes*, stated that "[o]f course, if the warranty is complied with at attachment, then the policy is effective and subsequent breaches merely suspend coverage until the breach is cured *and the consequences of the breach are obliterated*."  *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 983 n.28 (5th Cir. 1969) (emphasis added).

However, *Hejnes* was decided before *Wilburn Boat Co.*, and the Second Circuit cited a mixture of federal and New York law throughout the opinion, never indicating which body of law governed the case.  *See Hejnes*, 132 F.2d 715.  Furthermore, the Second Circuit provided no citations at all in support of its

---

[7]  In non-admiralty insurance cases, the *Hejnes* principle has been cited with approval by the Fourth Circuit, *see Fidelity-Phenix Fire Ins. Co. of N.Y. v. Pilot Freight Carriers*, 193 F.2d 812, 817-18 (4th Cir. 1952) ("The insured may not by breach of warranty increase the risk and put that added burden upon the insurer."); by the Supreme Court of South Dakota, *see Ranger Ins. Co. v. Macy*, 227 N.W.2d 426, 430 (S.D. 1975) ("[S]uspended coverage will not be reinstated by merely eliminating the proscribed condition *after* the statistically greater risk has manifested itself as an actual precarious circumstance."); and by the Western District of Virginia, *see Powell Valley Elec. Coop., Inc. v. U.S. Aviation Underwriters*, 179 F.Supp. 616, 618 (W.D. Va. 1959) ("It is well settled that when the coverage of an insurance policy is validly suspended that the coverage is not reinstated if anything has taken place while the insurance was suspended that would increase the insurer's risk of loss.).

principle regarding reinstatement after risk is increased, leaving ambiguous which body of law anchored the rule. *Id.* at 720. As for *Gulfstream Cargo,* the Fifth Circuit stated that it was "unnecessary" to resolve the choice of law question, *Gulfstream Cargo*, 409 F.2d at 981, because the state law and maritime law were not in conflict, "and there is every indication that if Florida's preceding law is inadequate to fill in all the gaps, Florida would draw heavily on maritime law in fashioning its own principles," *id.* at 980.

Thus, neither *Hejnes* nor *Gulfstream* clearly endorsed an established federal judicial rule regarding reinstatement of a suspended maritime insurance policy. Given that the Supreme Court has cautioned that "[t]he whole judicial and legislative history of insurance regulation in the United States warns us against the judicial creations of admiralty rules to govern marine policy terms and warranties," *Wilburn Boat Co.*, 348 U.S. at 316, I am reluctant to hold dispositively that such a federal rule governs. I turn to consideration of Massachusetts insurance law to resolve the issue.

### ii. Massachusetts Law

While I am not satisfied that the rule recited by the Second and Fifth Circuits clearly represents a judicially established federal admiralty rule, it ultimately makes little difference. Longstanding Massachusetts law applies the same rule. Under the

common law in Massachusetts, insurance contract coverage is not revived after a breach unless the risk to the insurer remains at the same level as it was prior to the breach.

The rule was first enunciated by the Supreme Judicial Court in 1866 in *Worthington v. Bearse*, 94 Mass. 382 (1866). In *Worthington*, the owner of a schooner temporarily sold thirteen sixteenths of the ownership of the schooner to another party, discharging the insurer. The interest was reconveyed to the owner, and subsequently the schooner was lost. *Worthington*, 94 Mass. at 382. The Supreme Judicial Court stated that the policy was not voided by the sale, but "was only suspended during the time that the title to the vessel was vested in the vendee, and was revived again on the reconveyance to the insured during the term specified in the policy." *Id.* at 384.

The policy was treated as revived because the risk had not increased during the period of suspension:

> No fact [was] shown from which any inference can be made that by the alienation of the title to the vessel during the time named in the policy, the risk of the insurers upon the subsequent retransfer of the vessel to the assured was in any degree increased or affected, or that any loss, injury or prejudice to the underwriter was occasioned by the fact that the absolute title to the vessel was temporarily vested in a third person.

*Id.* at 384-85. The Supreme Judicial Court explained:

> [W]hen this interest was revived or restored during the term designated in the policy, without any increase or change of risk or other prejudice to the underwriter, there seems to be no valid reason for holding the policy has become extinct. *Inasmuch as neither the subject nor the person*

23

*insured is changed, and the risk remains the same*, the intermediate transfer is an immaterial fact, which can in no way affect the claim under the policy.

*Id.* at 385 (emphasis added).

Two decades later, the Supreme Judicial Court summarized the case:

[I]n *Worthington v. Bearse*, 12 Allen. 382, it was held, on great consideration by this court, that if the assured in a marine policy temporarily parts with his interest in the property insured, and afterwards buys it again, the policy will revive, if there are no express provisions making it void, and there is no increase of risk.

*Hinckley v. Germania Fire Ins. Co.*, 1 N.E. 737, 739 (Mass. 1885). The Supreme Judicial Court then applied the principle to another occasion for suspension of a policy:

As between the insurer and the assured, there is no reason why the former should be allowed to avail himself of a temporary illegal use like that which existed in the present case [the operation, later ceased, of a business without a license] unless it can be shown that the subsequent risk was thereby increased, or the position of the insurer otherwise injuriously affected.

*Id.* The Massachusetts Supreme Judicial Court therefore effectively developed the *Hejnes* principle decades before it was pronounced by the Second Circuit.

In the instant case, no reasonable jury could find that the risk to the insurer was not increased during the period that the Policy was suspended. During that time, the boat ran aground on Devil's Back. The parties dispute whether the hull was breached or damage incurred before the passengers disembarked, but it is not necessary to determine the factual issue for purposes of the

motion before me.[8]  Keefe concedes that the puncture was caused
because the vessel listed to starboard in the waning tide; the
risk that the waning tide would cause a puncture was increased
(in a practical sense, it was created) because the boat was
grounded.  No reasonable jury could find that the grounding did
not lead to the puncture; therefore, Keefe raises no genuine
dispute regarding the increased risk.

Thus, under Massachusetts law, the Policy was not revived
when the passengers disembarked from the M/V WILHELMINA.  Whether
or not Keefe was still in violation of the condition precedent,
the coverage would not be reinstated until the increased risk was
neutralized.[9]  Where, as here, there is no clearly established

---

[8]  Keefe points to his own deposition testimony that the
damage occurred after the passengers left.  Northern Assurance
points to the ambiguity regarding the timing in the Coast Guard
Report and Statement of Loss (which Northern Assurance overstates
to be more than ambiguity and instead an acknowledgement that the
damage occurred while the passengers were aboard).  Additionally,
the Coast Guard Report documents an interview with Lebarron,
Keefe's deck-hand (and son-in-law), in which Mr. Lebarron states
that neither he nor Keefe "realized the WILHELMINA was leaking
until 10 minutes had gone by" after the grounding.  Dkt. 22-5, p.
42.  This may be sufficient to raise a factual question regarding
whether and how much damage was incurred before the passengers
disembarked.  However, the specific facts here are immaterial
because they do not have the potential to determine the relevant
issues in the litigation.

[9]  Similarly, Keefe may not claim indemnity under the
"Protection and Recovery Expenses" clause of the Yacht Policy.
The clause states that the insurer "will pay the reasonable costs
'you' incur to protect or recover the covered 'yacht' from
further loss or damage following an insured loss.'" Where, as
here, the loss itself is not covered (and thus not an 'insured
loss'), the "Protection and Recovery Expenses" clause does not

federal admiralty rule, state law may be said to govern.  Under longstanding Massachusetts case law, presaging the federal courts' embrace of the *Hejnes* principle, the coverage remained suspended even after the passengers disembarked.

### 3. Applicability of Conditions in Chartering Coverage Endorsement to Property Insurance Coverage

Keefe contends that the exclusions or conditions within the Chartering Coverage Endorsement apply only to the liability coverage and not to the property insurance coverage provided by the Policy.  In other words, Keefe argues that, while any coverage for personal injury or for personal property would be suspended during a violation of one or more of the conditions of the endorsement, coverage for the yacht itself would remain in place.

### I. Federal Admiralty Law

This presents a straightforward matter of contract interpretation. The parties do not contend, and I do not find, that any federal maritime rule applies.  Thus, I will turn to Massachusetts contract law to resolve the issue.  *See Littlefield v. Acadia Ins. Co.*, 392 F.2d 1, 6 (1st Cir. 2004) ("[W]e note

---

apply.  I note that in its briefing, Northern Assurance confuses the "Protection and Recovery Expenses" clause with the liability insurance covering "[t]he costs or expenses incurred for the attempted or actual raising, removal or destruction of the wreck of the covered 'yacht' if compulsory by law."  Keefe has not claimed indemnity under the latter clause and has not made a showing that the removal of the wreck of the yacht was compulsory by law.

that general principles of contract law are used to interpret marine insurance policies.")

### ii.  Massachusetts Law

In Massachusetts, interpretation of an insurance contract is a question of law for the court.  *Allmerica Financial Corp. v. Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418, 425 (Mass. 2007).  "An insurance contract is to be interpreted according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed."  *Id.* (internal citation omitted).  "Although it is true that ambiguities in an insurance contract must be construed in favor of an insured, it is equally true that clear and unambiguous provisions should be maintained unimpaired by loose and ill considered interpretations."  *Mutual Fire, Marine and Inland Ins. Co. v. Costa*, 789 F.2d 83, 87 (1st Cir. 1986) (internal citation and quotation omitted).

The plain terms of the exclusionary language in the Chartering Coverage Endorsement indicate that it applies to all categories of coverage included within the main body of the Yacht Policy.  The Endorsement states: "IF YOU VIOLATE ANY OF THESE TERMS AND CONDITIONS AT ANY TIME, THIS POLICY SHALL IMMEDIATELY BECOME NULL AND VOID . . . ."  Violation of the conditions therefore results in the suspension of the "policy," not of the liability insurance alone.  To the degree that Keefe is

contending the term "policy" is ambiguous, the Chartering Coverage also states that "[y]ou may charter the yacht described on the declarations page of this policy," which makes clear that the policy refers to the Yacht Policy (as it is labeled) as a whole; the Declaration Page is listed as starting on page 1 in the Yacht Policy Index.

Additionally, several individual conditions within the Chartering Coverage Endorsement indicate that the conditions apply to the entire policy and not to the liability coverage alone. Within the terms and conditions are the following:

3.　With regard to **Sections B-1 - LIABILITY INSURANCE, B-2 - POLLUTION LIABILITY, and SECTION D - MEDICAL PAYMENTS,** a deductible of **$100.00** shall apply to all claims arising from any one accident or occurrence. . . . .

7.　The NON-OWNED YACHT coverage provided in this policy will be null and void during the entire duration of any charter.

8.　**SECTION C - LONGSHORE AND HARBOR WORKERS' COMPENSATION INSURANCE** shall be null and void during the entire duration of any charter. "With regard to **SECTIONS B-1 - LIABILITY INSURANCE, B-2 - POLLUTION LIABILITY,** and **SECTION D - MEDICAL PAYMENTS,** a deductible of **$100.00** shall apply to all claims arising from any one accident or occurrence.

(emphases in original). The inclusion of limitations and exclusions relating to different types of coverage (and not just to the liability coverage) makes clear that the Chartering Coverage Endorsement exclusions apply to coverage under the Yacht Policy more generally.

There is no language to which Keefe can point that implies that the exclusions would be limited to the liability coverage. Keefe must argue that the Chartering Coverage Endorsement applies to all types of coverage in order to collect under the Property Insurance Coverage for the yacht itself, yet somehow simultaneously contend that the exclusions within the Endorsement apply to the liability coverage alone. Keefe offers no argument in favor of his reading, and no reason to believe that it is anything but a "loose and ill considered interpretation[]." *Mutual Fire, Marine and Ins. Co.*, 789 F.3d at 87 (quoting *Sherman v. Metropolitan Life Ins. Co.*, 8 N.E.2d 892, 895 (Mass. 1937)).

Keefe frames his argument by contending that he himself "understood this endorsement to have a direct effect on the liability portion of the policy, not the hull coverage." This subjective standard finds no support in the law and creates terminal inconsistency.

To the extent that Keefe is arguing that his personal interpretation is somehow determinative, the insured's subjective understanding does not set the standard for marine insurance contract interpretation. A court "must construe the words of the policy in their usual and ordinary sense." *Boston Gas. Co. v. Century Indemnity Co.*, 910 N.E.2d 290, 304 (Mass. 2009). Courts "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Hazen*

*Paper Co. v. U.S. Fidelity and Guaranty Co.*, 555 N.E.2d 576, 583 (Mass. 1990). Keefe's idiosyncratic interpretation, while it may be subjectively accurate, is not objectively reasonable. Under the unambiguous words of the Chartering Coverage Endorsement, compliance with the conditions is a prerequisite for any type of coverage in the policy.

To the extent that Keefe is arguing that the Chartering Coverage Endorsement as a whole applies only to liability coverage, then he has conceded that his damages are not covered under the Yacht Policy. Before the Endorsement was added, the Policy provided:

> Coverage under this policy applies only while the covered "yacht" is used for private pleasure purposes. This includes recreational boating and leisure time activities. *There is no coverage while the covered "yacht" is used for charter, hire, to carry persons or property for a fee or for any other commercial use unless prior written consent has been obtained from "us".*

(emphasis added). In order to claim any coverage for the accident under the Yacht Policy, Keefe must rely on the expanded coverage of the Chartering Coverage Endorsement; without the endorsement, the coverage does not apply to chartered excursions at all.

## D.    *KEEFE'S COUNTERCLAIMS*

Keefe did not comply with the conditions necessary to maintain coverage under the clauses based on which he claims indemnity. It is irrelevant whether the breach contributed to

the accident, and it is irrelevant whether the damage was incurred after the passengers disembarked, so long as the risk that accrued during the breach had not been neutralized. Therefore, Keefe has no valid claim for indemnity under the Yacht Policy.

Keefe's additional (non-declaratory judgment) counterclaims are all based upon and presuppose the claim that Northern Assurance wrongfully denied him coverage. Although Northern Assurance filed a motion seeking summary judgment on a number of those counterclaims on alternate grounds, those arguments are moot. Without a wrongful denial of coverage, Keefe cannot show that Northern Assurance breached their contract, breached the implied duty of good faith and fair dealing, violated G.L. c. 93A, or engaged in an unfair insurance claim settlement practice in violation of G.L. c. 176D.

## IV. CONCLUSION

For the reasons set forth above, I (1) DENY summary judgment to Keefe (Dkt. No. 27) and (2) GRANT summary judgment to Northern Assurance on Count 1 of the Complaint and on all Counterclaims (Dkt. No. 23). I find Northern Assurance's motion for summary judgment on alternative grounds as to Counts III, IV, and V (Dkt. No. 25) moot in light of the above rulings.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE